IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM COLVIN and COLVIN
CATTLE CO., INC.,                          Civil No. 05-409-AA

        Plaintiffs,                        FINDINGS OF FACT AND
                                             CONCLUSIONS OF LAW
    v.

BENJAMIN J. COLVIN and JUANITA
COLVIN,

        Defendants.
_____

AIKEN, Judge:

    On February 22, 2005, plaintiffs filed suit in state court
seeking declaratory relief regarding the division of plaintiff
Colvin Cattle Co, Inc.  On March 23, 2005, defendants removed this
action to federal court on grounds of diversity jurisdiction.
After extensive discovery and attempts at settlement, the court
commenced a two-day bench trial on March 6, 2007.  The court
received numerous exhibits and heard testimony from ten witnesses.
At the conclusion of trial, the parties requested additional time

1    - FINDINGS OF FACT AND CONCLUSIONS OF LAW

to review the transcript and submit post-trial briefing.  Upon
review of the exhibits, testimony and briefing, I issue the
following opinion, which constitutes the court's findings of fact
and conclusions of law.

<u>BACKGROUND</u>

Colvin Cattle Co., Inc. (the Corporation) is a closely-held
Oregon corporation with its principal place of business in Oregon,
with landholdings in Oregon and Nevada.  Plaintiff William (Bill)
Colvin, his brother, defendant Benjamin (Ben) Colvin, and Ben's
wife, defendant Juanita Colvin, are shareholders and directors of
the Corporation.  Bill owns fifty percent of the Corporation's
shares, and Ben and Juanita each own an undivided one-half interest
in the remaining fifty-percent of the Corporation's shares.  Bill
is the Corporation's President and Juanita serves as Secretary.

For many years, Bill and Ben's parents, L.C. (Bud) and Thelma
Colvin, operated a large cattle ranch in eastern Oregon.  The
Oregon ranch has approximately 15,000 acres of pasture and
timberland along with United States Forest Service permits.

In 1961, Ben began working full-time for Bud on the Oregon
ranch.  In 1965, Bill began working on the ranch.  Transcript of
Proceedings, p. 10 (Tr. 10).

In 1968, Bud expanded the cattle operation and purchased the
40 Bar Ranch in southwestern Nevada.  Tr. 12.  Bud sent Ben to run
the Nevada cattle operation, while Bill stayed in Oregon and helped

2    - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bud run the Oregon ranch.  Tr. 18.

Until 1997, the Nevada ranch consisted of several lots in Goldfield, Nevada and landholdings in the mountains totaling approximately 540 acres, along with grazing and water rights on the adjacent Montezuma Allotment.  Tr. 12; Ex. 24.

The Montezuma Allotment is approximately 560,000 acres of public rangeland managed by the Bureau of Land Management (BLM). Tr. 12; Ex. 24.  The Corporation obtained grazing rights on the Montezuma Allotment shortly after Bud acquired the 40 Bar Ranch. The right to graze cattle on the Montezuma Allotment was essential to support the 40 Bar Ranch as a cattle ranch; without the allotment, the ranch has no water or adequate grazing pasture.  Tr. 13.

Bud and Thelma formed the Corporation shortly after the purchase of the 40 Bar Ranch and conveyed the property and equipment in Oregon and Nevada to the Corporation.  Ex. 216.  Bud and Thelma each owned 2,500 shares of the Corporation and served as the Corporation's president and treasurer, respectively.  Bill and Ben were first and second vice presidents.  Ex. 216.

In the 1970s, Ben recommended to Bud that he sell the Nevada ranch, because it was difficult to operate at a profit with rising fuel prices.  Tr. 16-17, 51.  Bud remained committed to the Nevada operation and refused to sell it.  Tr. 17.

Bud died in 1988, and Thelma died in 1989.  Bud and Thelma

3    - FINDINGS OF FACT AND CONCLUSIONS OF LAW

devised their shares of the Corporation to Bill and Ben equally, so that each owned a fifty percent share of the Corporation. After their parents died, Bill remained at the Oregon ranch, and Ben remained in Nevada. At the time, both ranches had approximately 800-900 head of cattle, with Bill rotating the cattle among the various pastures in Oregon, and Ben grazing the cattle on the Montezuma Allotment pursuant to the terms of the Corporation's grazing permit. Tr. 18, 178.

In 1990, Bill and Ben conveyed an undivided one-half interest in their shares to their respective wives, Joyce Colvin and Juanita Colvin. Bill was elected President, with Ben and Juanita vice-presidents and Joyce the secretary/treasurer.

By 1990, the numbers of wild horses and burros on the Montezuma Allotment had increased substantially and reduced the amount of forage and water available for cattle.[1] Tr. 19, 50, 54, 144-45. According to Ben, the horses and burros were devastating to the herd - cows would not calve, and they were thin and not in marketable condition. Tr. 146-47. Ben moved the majority of his brood herd from Nevada to a place near Baker, Oregon, and eventually near Toppenish, Washington, because there was more feed

---

[1]According to Ben's testimony, the BLM had built fences around the Montezuma Allotment, primarily to keep cattle off of adjacent shooting and bombing ranges. Tr. 144. However, the fences concentrated the numbers of wild horses in the area, and they eventually broke through a fence and onto the Montezuma Allotment. Tr. 144.

4    - FINDINGS OF FACT AND CONCLUSIONS OF LAW

and year-round pasture.  Tr. 147-48.  Ben did not want to sell the herd, because the cattle were in such poor condition Ben did not think they would sell for what they were worth.  Also, Ben thought that eventually he would return the cattle to the Montezuma Allotment.  Tr. 23, 50.

Neither Bill nor Ben remembers whether they discussed Ben's decision to move the brood herd to Washington.  Tr. 22, 180.  Regardless, Bill did not object at that time.  Tr. 181; Ex. 217.

After he moved the brood herd in 1990, Ben voluntarily reduced the designated number of cattle authorized by the grazing permit to approximately fifty.  Tr. 28-29.  Ben kept fifty head of cattle on the Montezuma Allotment in order to retain the Corporation's water rights.  Tr. 19, 50, 148.

According to Ben, the grazing fees for the Montezuma Allotment were $1.70/head per month - roughly $17,000 to $18,000 per year for 850 or 900 head of cattle.  Tr. 21.  After the brood herd was moved to Washington, the Corporation paid approximately $900 in grazing fees for fifty head of cattle and another $70,000 to $80,000 per year for pasture, water, feed, and veterinary care for the cattle.  See Exs. 15, 224; Tr. 21, 57-58.  Ben traveled to Washington several times a year to wean and sell calves, to help with branding, and to check on the herd generally.  Tr. 149, 330.

In 1992, Bill and Joyce divorced.  As part of the property settlement with Joyce, Bill agreed to buy Joyce's interest in the

Corporation for approximately $1 million.  Bill, Ben, and Juanita agreed that Bill would borrow the money from the Corporation at a rate of 6% to buy Joyce's interest.  Tr. 36; Ex 2.  To raise the funds, the parties agreed that Corporation would either borrow funds from a lending institution or use proceeds from the sale of timber on the Oregon ranch.  Ex. 2.

In October of 1992, Bill, Ben and Juanita entered into a Loan Agreement, in which they agreed that the Corporation would sell timber sufficient to fund Bill's purchase of Joyce's interest and pay the resulting tax obligations.  Ex. 3; Tr. 38, 41. Additionally, the parties agreed that the Corporation would sell timber at a later date to fund an equal distribution to Ben and Juanita.  Finally, the parties agreed that Bill would sign a promissory note for the borrowed funds, and Ben and Juanita would determine when and if the Corporation would sell additional timber to pay Ben and Juanita the same amount Bill received, plus interest.  If and when Ben and Juanita received their distribution from a second timber sale, the Corporation would cancel Bill's note.  Ex. 3.

Subsequently, at Bill's behest, he and Ben agreed that the Corporation would sell enough timber to fund equal distributions to Bill and Ben at the same time.  Ex. 1; Tr. 36-41.

In December 1992, Bill and Ben - on behalf of the Corporation - entered into a $3.2 million timber sales agreement with Boise

Cascade.  Exs. 1, 4, 5.  Boise Cascade agreed to pay $1.8 million as a down payment, with the remainder to be paid when the timber was harvested.  Bill's distribution would be funded from the down payment, and Ben and Juanita's distribution would be funded from the remaining payment.  Ex. 1.

In 1993, the Corporation received the first payment from Boise Cascade.  Of this amount, $940,517 was distributed to Bill to buy Joyce's interest in the Corporation.  The remaining money was used to pay Bill's and Ben's personal income taxes arising from the sale of the timber.  Because the Corporation is a subchapter S corporation, the capital gains from the timber sale were taxable to the individual shareholders.

In 1995, the Corporation received the remaining payment for approximately $1.4 million from Boise Cascade.  However, Ben and Juanita did not take their distribution as the parties originally intended.  Rather, Ben and Juanita agreed to leave the money in the Corporation to cover operating losses, primarily those of the Nevada ranch, so that the Corporation would not be required to borrow money from a financial institutional and pay interest.  Tr. 45, 186-87.  The capital gains were taxed to Bill and Ben individually and the Corporation paid the taxes.

In late 1994, Ben refused to complete an application to renew the Corporation's grazing permit on the Montezuma Allotment.  The application authorized grazing at 10,068 Animal Unit Months to

7    - FINDINGS OF FACT AND CONCLUSIONS OF LAW

support 839 head of cattle, although Ben had voluntarily reduced the permit to 50 head of cattle.  Ex. 224.

In early 1995, Ben withheld $908.04 in grazing fees owed to the BLM.  Tr. 67; Ex. 6, p. 6; Ex. 224.  Ben withheld the fees because he disagreed with BLM's management policies and had come to believed that the Montezuma Allotment was not public land and that the BLM had no authority to regulate grazing on the allotment.  Ex. 6; Tr. 61, 69-70.  Ben did not consult with Bill before withholding the grazing fees.  Tr. 189-90.

On March 15, 1995 the BLM issued a notice of trespass and began imposing penalties against the Corporation for grazing cattle on the Montezuma Allotment without a grazing permit.  Ben responded by sending a letter to the Nevada director for the BLM requesting documents proving the federal government's title to federal land.  Ex. 6, p. 6.  The BLM sent a letter to Ben discussing the BLM's regulatory authority and encouraging Ben to resolve the trespass issue with employees in the BLM's Tonopah Office.  Ex. 6, p. 5.

On November 10, 1995, attorney John Howard sent a letter to a Department of Justice trial attorney on behalf of Ben, indicating that Ben had "followed poor advice" and had "come to realize that it was not the proper way to proceed."  Ex. 6, p. 5.  The letter also offered to pay the accrued grazing fees without penalties or interest.

On February 2, 1996, a settlement meeting was held at the BLM

Tonopah Office.   Ben offered to pay the grazing fees without trespass penalties and requested a 10-year grazing permit with no changes or reevaluations of the permit for ten years.   The BLM refused Ben's offer.  Ex. 6, p. 6.

On May 9, 1996, another settlement meeting was held to resolve the trespass issue.   Ben offered to pay $3,500 and agreed to a grazing management plan to be drafted by BLM and sent to Ben for review.  Ex. 6. p. 6.  On July 17, 1996, another settlement meeting was held, and Ben indicated that he could not accept the proposed grazing management agreement.   The agreement was reviewed and the parties verbally agreed on several changes.   Ex. 6, p. 6.   In September 1996 Ben stated to a BLM official that he would not sign a formal agreement including a settlement agreement or grazing management plan.  Ex. 6, p. 6.  Ben was later encouraged to settle the trespass and grazing management issues in a hearing regarding the appeal of a multiple use decision.  Ex. 6, p. 6; Ex. 225.

By 1996, the BLM had removed most of the wild horses and burros from the Montezuma Allotment.  Tr. 55-57, 145-46; Ex. 15, p. 45.  However, Ben could not move the brood herd back to Nevada, because Ben feared that the herd would be confiscated by the BLM for his failure to pay the trespass penalties and grazing fees. Tr. 61, 66.

On May 21, 1997, the BLM issued a "Proposed Decision Order to Remove and Demand for Payment on the Montezuma Allotment." See Ex.

6, p. 1.   On June 6, 1997, Ben filed a protest and continued to challenge the federal government's ownership of the land.   The BLM rejected Ben's protest, and on July 24, 1997 the BLM issued a "Final Decision" concluding that the Corporation had been "knowingly, and willfully grazing livestock without a grazing authorization." Ex. 6, p. 7.   The BLM demanded payment of fees and penalties in the amount of $37,332.26 and stated that it would cancel the Corporation's grazing permit and remove the cattle if payment was not made within 15 days. Ex. 6, p. 8.   Ben did not pay the fees, and the BLM cancelled the Corporation's grazing permit for the Montezuma Allotment.

Ben did not inform Bill that he had lost the Corporation's rights to graze on the Montezuma Allotment.   Instead, Bill first learned that BLM cancelled the Corporation's permit from either an article in the Livestock Journal or his cousin, Tom Colvin.   Tr. 192, 223.

Ben appealed the BLM's July 24, 1997 decision, but his appeal was dismissed by an Administrative Law Judge on grounds that the appeal was frivolous and did not clearly state why Ben believed the decision was in error.   Ex. 8.

Ben appealed the dismissal to the Interior Board of Land Appeals (IBLA).   Ex. 14.   The IBLA upheld the dismissal, rejecting Ben's arguments that the federal government did not possess title to the Montezuma Allotment and had no regulatory authority over the

10   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

land. Ex. 14, pp. 5-6. Finally, the IBLA noted that Ben did not deny grazing cattle on the Montezuma Allotment without authorization. Ex. 14, p. 7.

In July 1997, Ben and Juanita sought their $1 million disbursement from the 1993 timber sale proceeds, asserting that Ben intended that the Corporation use his money for operating expenses only "for a year or two." Ex. 7. Ben knew that the Nevada operation had been running at a loss since the brood herd moved to Washington, and he wanted his distribution while the Corporation still had funds to pay it. Tr. 47. Bill refused to authorize the disbursement.

In 1998, Ben moved the cattle from the Montezuma Allotment to a neighboring rancher's land and then to 40 Bar Ranch property in Goldfield, Nevada. Tr. 155-56. The herd increased to 62 in number, and in April 2001 Ben turned them out on the Montezuma Allotment, even though he had not paid the grazing fees or trespass penalties. Tr. 158.

The BLM seized the cattle on the Montezuma Allotment and sold them at auction on November 13, 2001. Ex. 9. Ben estimated the value of the cattle at $40,000, but the cattle sold for only $13,000 at auction. Tr. 91. Notably, Ben had informed potential buyers that the BLM did not have "title" to the cattle and was not authorized to sell them. Ex. 9.

Through 2002, Ben deposited all income or revenue for the

Nevada ranch into the Corporation's Oregon account.  Tr. 99.  Bill would then forward funds to cover the expenses of the Nevada ranch as reported by Ben.  Although Bill questioned some of Ben's expenses, Ben testified that Bill never denied his requests.  Tr. 171.

In late 2002, Ben sold the brood herd that had moved to Washington in 1990.  Ben testified that he sold the herd because it was not profitable to pasture them in Washington.  Tr. 91-92, 96.  Further, with no grazing rights on the Montezuma Allotment, Ben had no place to keep the herd.  Ben did not consult with Bill prior to selling the herd, although he thought that was what Bill wanted.  Tr. 92.

With proceeds from Nevada herd, Ben invested in a $100,000 certificate of deposit and established a separate checking account under his control.  Tr. 101-02.  Most of money was spent on legal fees and Ben's and Juanita's living expenses.  Tr. 103; Ex. 268.  As a result of Ben's actions, Bill stopped authorizing funds for the expenses of the Nevada ranch and Ben's salary.  Tr. 108-09, 191.

On August 16, 2003, Ben filed suit against the federal government on behalf of the Corporation, following in the footsteps of friend, neighbor, and fellow rancher Wayne Hage.  <u>See</u> Ex. 11.  Ben alleged breach of the Corporation's grazing permit and a Fifth Amendment takings claim, relying on a ruling in Hage's case that

ownership of water rights on federal land grants a limited property interest in the land to access and use the water.  See Hage v. United States, 51 Fed. Cl. 570 (Fed. Cl. 2002).  Ben did not seek reinstatement of the Corporation's grazing permit; rather, Ben claimed $30 million in damages, including $2 million for the 40 Bar Ranch and $4 million for the Corporation's water rights on the Montezuma Allotment.  Ex. 11.

Ben did not consult with Bill before filing suit on behalf of the Corporation.  Tr. 119-20.  Instead, Bill learned from either Tom Colvin or a newspaper article that Ben had sued the federal government.  Tr. 191-92, 223.

On October 20, 2003, Bill and Ben entered into an Agreement to Divide Business and an Agreement to Arbitrate in an effort to "resolve any and all disputes between the parties concerning the Corporation."  Exs. 12, 13.  Under the Agreement to Divide Business, the Corporation is to be divided as follows:

> The Corporation shall form a new wholly owned subsidiary, and shall convey and transfer to the new subsidiary all of the assets, including livestock, used in connection with one of the ranching operations, as well as such specified assets and such amount of cash and debt so that the net worth of the new subsidiary is in the amount of the dollar value of the ownership of the corporation of the shareholder receiving the subsidiary.  The purpose of this division is that the net worth of the companies after division shall accurately reflect the actual net ownership of the shareholders of the Corporation before division.

Ex. 12, p. 2.

Upon division of the Corporation as set forth above,

> [s]tock of the new subsidiary will be distributed to one
> of the shareholders in exchange for a complete redemption
> of all his/her interest in the corporation.  If the new
> subsidiary consists of the Oregon operation, the stock
> shall be distributed to Bill Colvin.   If the new
> subsidiary consists of the Nevada operation, the stock
> shall be distributed to Juanita Colvin.

Ex. 12, p. 2.

Under the Agreement to Arbitrate, Bill and Ben agreed to arbitrate "any and all disputes between the parties concerning the Corporation." Ex. 13, p. 1.  Any arbitration determination was to be final and binding, "unless a party appeals by filing a complaint in a court of competent jurisdiction within forty-five (45) days." Id.  The parties agree that they have performed fully under the Agreement to Arbitrate.

On September 2, 2005, the Court of Claims dismissed Ben's lawsuit, and on November 1, 2006, the dismissal was upheld by the Court of Appeals for the Federal Circuit.  Exs. 19-20. Accordingly, the Corporation has no grazing rights on adjacent federal land and will not be compensated for the loss of such rights, rendering it impossible for the 40 Bar Ranch to maintain a viable cattle operation.

In contrast, the Oregon ranch currently has approximately 800 head of cattle. Tr. 202-03. At the time of trial, the herd was at the Home Place pasture, where Bill feeds them hay. Tr. 203. After calving and branding in April or May, Bill takes the cattle up the river to Wildcat and Huckleberry for grazing. Tr. 203-04. Then,

14   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

at the beginning of June, Bill turns them out on Forest Service land. Tr. 205. After a couple of months, Bill moves them to Modoc until the first snow, usually in November. Tr. 206-07. Bill then takes them back to Wildcat. Tr. 207. Around the first of January, the cattle are rounded up and taken to the Home Place for feeding until spring. Tr. 207-08. Bill does his own veterinary care and birthing of calves and brands cattle with the assistance of his wife, Peggy, friends, and neighbors. Tr. 218, 219. In other words, the Oregon ranch maintains a continuing cattle operation, one that Bill intends to keep on running. Tr. 178.

DISCUSSION

Bill and the Corporation seek a declaratory judgment that Ben acted unreasonably and without the Corporation's authorization in operating the 40 Bar Ranch, and that all operating losses since 1990 and fees and trespass penalties associated with the grazing permit should be charged against Ben personally. Bill also seeks a declaration that he is not obligated to repay the funds disbursed to him in 1992. Finally, Ben seeks a declaration that the Oregon and Nevada ranches are of equal value for purposes of the Agreement to Divide Business.

In turn, Ben and Juanita seek declaratory and injunctive relief requiring the distribution of funds to Ben and Juanita pursuant to the 1992 Loan Agreement, or alternatively, an order requiring Bill to repay the funds, with interest, disbursed to him

under the 1992 agreement.  Further, Ben seeks a declaration that he is entitled to his yearly salary since 2002 and that Bill should be personally accountable for his extraordinary personal expenditures.

At the outset, I find that the Agreement to Divide Business governs this action.  Pursuant to that agreement, the parties agreed to "split" the ranching operations and form a wholly-owned subsidiary comprised of the either the Oregon or Nevada operation, along with cash and/or other assets, if necessary, to reflect the "net" ownership of the shareholder who receives the subsidiary. Once the subsidiary is formed, the stock will be distributed to one of the brothers in exchange for a complete redemption of all interest in the Corporation.  Further, the parties intended that the Oregon ranch be transferred to Bill and the Nevada ranch to Ben.  Ex. 12.

Both parties agree that assets or cash must be transferred with the Nevada operation to reflect the parties' interest in the Corporation.  Therefore, I find that the subsidiary corporation will consist of the 40 Bar Ranch and any other property, equipment, or assets of the Nevada ranch, and that the stock of the subsidiary shall be transferred to Ben and Juanita upon its formation.

However, the parties dispute the amount of cash or assets that must be transferred with the Nevada ranching operation to reflect Ben and Juanita's interests.  Bill maintains that an additional $506,701 or $454,451 in cash or assets must be transferred to the

16   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

subsidiary to reflect Ben and Juanita's interest.  See Ex. 22, p.
1; Plaintiffs' Post-Trial Memorandum, pp. 12-13.  In turn, Ben
maintains that over $5,000,000 must be transferred, given the
current market value of the Nevada operation and Bill's debt to the
Corporation.[2]  Defendants' Post-Trial Memorandum, pp. 7-8.

     In support of his position, Bill relies on the expert report
of Jim Dickey, CPA, and his "Calculated Adjusted Shareholder
Equities."  Exs. 21 and 22.  Ben and Juanita do not question Mr.
Dickey's qualifications, credentials, or the accuracy of his
calculations.  Tr. 364, 368-69.  Rather, based on the conclusions
of their expert, Kevin Kirkendall, CPA, Ben and Juanita challenge
some of the figures and assumptions utilized by Mr. Dickey in
preparing his report.  Tr. 364-67; Ex. 215, pp. 3-4.  I agree that
Mr. Dickey is eminently qualified as an accounting expert.
Therefore, to the extent that Mr. Dickey's calculations are not
challenged by Ben and Juanita, I adopt them and utilize his
framework for the adjusted shareholder equities to determine
parties' interests in the Corporation.

_____

     [2]In their post-trial memorandum, Ben and Juanita propose two
buy-out alternatives:  either Ben pays $4,000,000 to buy or
"redeem" Bill's interest in the Corporation or Bill pays
$5,561,622 to buy Ben's interest.  Defendants' Post Trial
Memorandum, p. 8.  However, the Agreement to Divide Interest does
not contemplate that either Bill or Ben would buy the other's
interest and obtain sole ownership of the Corporation's assets.
Rather, Bill and Ben agreed to divide the Oregon and Nevada
operations and transfer cash and assets to reflect the parties'
interests in the Corporation.  Therefore, I do not consider the
buy-out options proposed by Ben and Juanita.

17   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ben and Juanita challenge three aspects of Mr. Dickey's adjusted shareholder equities as set forth in Exhibit 22, page 2: 1) the amount that Bill owes to the Corporation for his 1992 distribution; 2) the adjustments to Ben's equity based on Nevada operating losses, fees, and penalties; 3) and the value of the Oregon and Nevada operations.[3]  <u>See</u> Def. Ex. 215; Tr. 364-67. Additionally, as noted above, Ben maintains that the shareholder equities should reflect salary owed to him since 2002 and adjustments to Bill's equity for personal expenditures.

## A.  1992 Disbursement to Bill

Bill seeks a declaration that he is not required to reimburse the Corporation for the disbursement he received to fund his divorce settlement, because Ben received his distribution but elected to leave it in the Corporation to cover operating losses for the Nevada ranch.  Therefore, Bill argues that Ben is barred from seeking repayment or an equal distribution on grounds of waiver, statute of limitations, laches, and Ben's breach of the obligation of good faith and fair dealing by failing to take his distribution.  Further, Bill maintains that Ben essentially forfeited his distribution because the operating expenses covered by earmarked funds were caused by Ben's mismanagement of the Nevada ranch.

------

[3]Notably, some of the adjustments to Ben's equity and the value of the ranches were assumed by Mr. Dickey based on information provided by plaintiffs' counsel.

18    - FINDINGS OF FACT AND CONCLUSIONS OF LAW

It is undisputed that Ben agreed to leave his share of the timber sale proceeds in the Corporation to cover operating expenses so that the Corporation would not be required to borrow funds and pay interest. However, I find no evidence to suggest that Ben "forfeited" his right to receive an equal distribution by allowing the funds to remain in the Corporation. The fact that Ben sought his share of the proceeds in 1997 coupled with the parties' tolling agreement renders the principles of laches, estoppel, and waiver inapplicable. See Ex. 270; Day v. Advanced M & D Sales, Inc., 336 Or. 511, 518-19, 86 P.3d 678 (2004) (explaining principles of estoppel; McMillan v. Follansbee, 194 Or. App. 145, 154-55, 93 P.3d 809 (2004) ("To make out a case of waiver of a legal right there must be a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part.") (quoting McMillan v. Montgomery et al., 121 Or. 28, 32, 253 P. 879 (1927)).

Resolution of this issue is complicated by the fact that the parties deviated from the Loan Agreement. Under the Loan Agreement, "When [Juanita Colvin] receives money equal to the amount Bill Colvin borrows from the corporation, plus interest on Bill Colvin's promissory notes, Juanita Colvin will have the corporation cancel Bill Colvin's promissory notes. . . . Ben Colvin and Juanita Colvin will not let the corporation enforce Bill Colvin's promissory notes except for selling timber as stated in

this paragraph." Ex. 3, p. 2. Of course, Bill did not sign promissory notes for the disbursement, presumably because Ben and Juanita agreed to sell sufficient timber to fund both disbursements at the same time. Consequently, there is no promissory note to enforce. Even if there was a promissory note, the agreement provides that it cannot be enforced except through the sale of timber to fund an identical distribution - a sale and distribution that has already occurred.

Even if I adopted Bill's argument and found that Ben's distribution was intended to cover operating losses of the Nevada operation, the distribution of $940,157 still would be credited to Ben with such losses charged against him. Therefore, the funds distributed to Bill in the amount of $940,157 must be accounted for - either from Bill or to Ben.

Ultimately, I resolve this issue based on the Corporation's treatment of the timber sale proceeds. As Mr. Dickey testified, the disbursement to Bill was considered a loan to shareholders. Tr. 269. However, the disbursement originally intended for Ben and Juanita was not "earmarked" for Ben in the books or recorded as a payable or liability. Tr. 272. Therefore, I find that the $940,157 was considered a loan by the Corporation and must be accounted for by Bill as reflected by Mr. Dickey's calculated shareholder equities. See Tr. 269; Ex. 22, p. 2 ("Less shareholder loans per corporate books"). Whether Ben and Juanita's equity

interest should be adjusted for the operating losses of the Nevada ranch is a separate issue discussed below.

The final issue is the amount of interest that Bill owes. I adopt Mr. Dickey's calculation of the interest as of September 1995 in the amount of $149,514.36. Ex. 34. At that time, the second timber payment was made to the corporation and Bill's obligation on the loan was intended to have ceased. If Ben had taken his distribution as originally intended, Bill would have owed no further interest *to* the Corporation, even though Ben's distribution would have been taken *from* the Corporation. I fail to discern why the result is different when Ben's distribution was left in the Corporation to avoid paying interest on a bank loan.

Therefore, Bill's shareholder equity shall be adjusted to reflect the $940,157 disbursement and interest in the amount of $149,514, as set forth in Mr. Dickey's calculations.

B.  Adjustments to Shareholder Equities

The next issue is whether any expenses of the Corporation or other losses should be charged against Ben or Bill personally.

In the case of "close" corporations, a special duty exists between "those in control of corporate affairs," including the majority shareholder and corporate directors, and the minority shareholders. Zidell v. Zidell, Inc., 277 Or. 413, 418, 560 P.2d 1086 (1977); Noakes v. Schoenborn, 116 Or. App. 464, 471, 841 P.2d 682 (1992).  "Directors owe similar duties to the corporation."

<u>Naito v. Naito</u>, 178 Or. App. 1, 20, 35 P.3d 1068 (2001). The duty is one of "loyalty, good faith, fair dealing and full disclosure." <u>Chiles v. Robertson</u>, 94 Or. App. 604, 619, 767 P.2d 903 (1989). When an director, officer or majority shareholder takes action for his or her own benefit at the expense of the corporation or other shareholders, the action constitutes a breach of fiduciary duty. <u>See, e.g.</u>, <u>Noakes</u>, 116 Or. App. at 472, 841 P.2d 682.

Here, the Corporation possesses the characteristics of a close corporation: (1) a small number of shareholders; (2) capital stock that is not traded publicly; and (3) the lack of a formal separation between ownership and management. <u>See</u> <u>Estate of Schroer v. Stamco Supply, Inc.</u>, 482 N.E.2d 975, 978 (Ohio App. 1984). Thus, I find that a special duty of loyalty, good faith, fair dealing and full disclosure exists between Bill and Ben and Juanita.

<u>1. Nevada Losses</u>

Bill seeks to charge Ben with operating losses from the Nevada ranch and fees, penalties and other financial losses resulting from the forfeited grazing rights and sale of cattle. Bill argues that Ben acted without the Corporation's approval and breached his fiduciary duty to the Corporation by acting for his own benefit in withholding the grazing fees, keeping the brood herd in Washington, ultimately selling the brood herd in 2002, and filing suit against the federal government in 2003. Ben responds that he is protected

from liability by the business judgment rule, that he was acting in the interest of the Corporation, and that any losses are those of the Corporation and cannot be charged against him personally. Further, Ben maintains that Bill had notice and was aware of Ben's decisions regarding the Nevada operation but took no action.

With the exception of initially moving the brood herd to Washington in 1990, I agree that Ben did not obtain authorization from the Corporation before taking these actions. Although Bill and Ben had an unspoken, unwritten agreement that they would manage the day to day operations of each ranch independently, many of Ben's actions went far beyond decisions made in the ordinary course of business. By withholding grazing fees (and ultimately losing the Corporation's grazing rights) and selling the brood herd, Ben essentially rendered the 40 Bar Ranch a defunct cattle operation, contrary to the Corporation's purpose. Moreover, in appealing the BLM's decision and filing suit against the federal government, Ben incurred tremendous legal fees and placed the Corporation's assets at risk - decisions that are not within Ben's ordinary course of business in running the Nevada operation.

Further, Ben does not dispute that he failed to consult with Bill regarding any of these decisions. Tr. 119-20, 190. Before taking action that could potentially result in such severe consequences, Ben was obligated to consult with Bill and make a good faith decision on how to proceed. He did not, apparently

because Ben and Juanita believed that Bill was not an "equal" shareholder as long as the disbursement to fund his divorce settlement remain unpaid. Tr. 81; Ex. 7, p. 1.

Finally, I reject Ben's contention that Bill ratified or otherwise knew and approved of Ben's actions. Ben presents no evidence that Bill knew that Ben had jeopardized the Corporation's grazing rights until 1997, when the permit was cancelled, or that Bill knew ahead of time that Ben intended to sell the brood herd in Washington. The only exception is Ben's initial decision to move the brood herd to Washington in 1990. Neither Bill nor Ben remembered whether they discussed moving the herd; however, Bill testified that he did not object at the time so I will give Ben the benefit of the doubt and find that Bill agreed to move the herd in 1990.

The next issue is whether Ben's actions are protected by the business judgment rule. The business judgment rule is a presumption that, in making a business decision, the directors of a corporation acted on an informed basis, "in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner the director reasonably believes to be in the best interests of the corporation." Or. Rev. Stat. § 60.357(1); Navellier v. Sletten, 262 F.3d 923, 946 n.12 (9th Cir. 2001); see also FDIC v. Castletter, 184 F.3d 1040, 1044 (9th Cir. 1999) (business judgment rule protects corporate

24   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

officials from liability for breaches of the duty of care so long as they act in good faith and without a corrupt motive).  "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose." Navellier, 262 F.3d at 946 n.12 (internal quotation marks and citation omitted). When applicable, the business judgment rule "insulates directors from liability, and imposes upon the party challenging the decision the burden of rebutting the presumption." Id. (citation omitted).

The presumptive validity of an exercise of business judgment is rebutted in cases where the decision under attack is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."  In re J.P. Stevens & Co., Inc. Shareholders Litig., 542 A.2d 770, 780-81 (Del. Ch. 1988); see also Zidell, 277 Or. at 418, 560 P.2d 1086 (fiduciary duty "is discharged if the decision is made in good faith and reflects legitimate business purposes rather than the private interests"); Noakes, 116 Or. App. at 472, 841 P.2d 682 (actions taken for own interests rather than that of corporation, "absent a legitimate business purpose," constitute a breach of fiduciary duty).

I find that Ben's decision to withhold payment of grazing fees - ultimately resulting in the loss of grazing rights on the

Montezuma Allotment and the seizure of the Corporation cattle - went far beyond the bounds of reasonable judgment and is not insulated by the business judgment rule. It is undisputed that the Corporation had paid grazing fees since it obtained rights to graze on the Montezuma Allotment, and Ben knew that if he did not pay the grazing fees, the Corporation's grazing rights could be lost. Further, Ben knew that without grazing rights on the Montezuma Allotment, the 40 Bar Ranch could not sustain a cattle operation - the primary business of Colvin Cattle Co.

Despite this knowledge, Ben inexplicably and repeatedly refused to pay the grazing fees or the trespass penalties once he realized that withholding fees was not the best course of action. Ben's unauthorized actions had the potential to - and did - irretrievably alter the operations and profitability of the 40 Bar Ranch, essentially rendering it a defunct cattle operation. Withholding the Corporation's grazing fee is not a decision that an ordinarily prudent person in a like position would exercise under the circumstances or one that Ben could reasonably believe to have been in the best interests of the Corporation.

I do not accept Ben's justification that he withheld the grazing fees because of grazing restrictions imposed by the BLM in a Range Management Plan (RMP). According to Ben, the RMP contemplated that wild horses and burros would continue to graze on the Montezuma Allotment and proposed a grazing scheme where Ben

allegedly was required to rotate cattle among pastures and remove all cattle from certain ranges from March 1 through June 1 of each year. Tr. 151. However, Ben testified that he did not return the brood herd to Nevada in 1996 or 1997 was because of his dispute with the BLM - not because of wild horses and burros or any grazing limitations. In fact, Ben agreed that as early as 1990 the BLM began to remove wild horses and burros from the Montezuma Allotment, and that most wild horses and burros were gone by 1996. Tr. 55-57, 145. Thus, had Ben paid the grazing fees and penalties for the Montezuma Allotment, Ben could have resumed an active cattle operation as early as 1995 or 1996. Tr. 61, 66. Instead, the brood herd remained in Washington at great cost for another six or seven years. Tr. 21.

Moreover, Ben failed to submit the offending RMP and provided no supporting exhibits or affidavits to support his claim that a revised RMP made it impossible to graze cattle on the Montezuma Allotment at the time he withheld grazing fees.[4] To contrary, the evidence submitted shows that the RMP was not yet complete when he withheld the fees, and that the BLM attempted to work with Ben and create a grazing management plan that would meet the needs of the

_____

[4]In fact, after the permit was cancelled and Ben lost the Montezuma Allotment, the BLM granted grazing rights on the allotment to another rancher and required him to provide his own water. Ex. 19, p. 3. This fact belies Ben's claim that the BLM made it impossible to resume cattle ranching on the Montezuma Allotment, particularly when the Corporation retained water rights on the allotment.

27    - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Nevada operation and settle the trespass dispute.  Ex. 6, pp. 5-7.
Even if the proposed RMP was problematic, Ben could have challenged
the RMP rather than withhold grazing fees.

Given the record as a whole, I find that Ben withheld fees
based on the widespread belief of cattle ranchers in Nevada that
public rangelands were not property of the United States and that
the BLM had no regulatory authority over the Montezuma Allotment.
Ex. 6, pp. 5-6; Ex. 225.  Importantly, however, Ben still could
have pursued his administrative appeals and challenged the BLM's
regulatory authority had he paid the grazing fees and trespass
penalties.  Tr. 390; Ex. 6, p. 7.  Instead, Ben unilaterally and
without authorization refused to pay the grazing fees and
penalties, thus jeopardizing the viability of the 40 Bar Ranch as
a cattle operation and placing.  Although Ben kept only 50 to 60
head of cattle on the Montezuma Allotment from 1990, the grazing
permit authorized 839 head of cattle.  Ex. 224, p. 4.  Therefore,
if Ben had paid the grazing fees and penalties, he could have
resumed a ranching operation similar in size to that of the Oregon
ranch, dramatically reduced the expense of maintaining the brood
herd, avoided unnecessary legal fees and penalties, and sustained
or increased the market value of the 40 Bar Ranch.

Accordingly, I find that Ben's failure to pay the necessary
fees and penalties to retain grazing rights on the Montezuma
Allotment constituted a breach of his fiduciary duty to Bill and

the Corporation.  While Bill maintained a viable ranching operation in Oregon, Ben squandered the grazing rights to the Montezuma Allotment held by the Corporation for almost thirty years and rendered the Nevada ranch virtually worthless as a cattle operation.  In making this finding, I do not necessarily attribute malicious motives to Ben.  Instead, it appears likely that Ben became caught up in the property rights agenda promoted by fellow ranchers and took a stand against the federal government and the BLM.  Exs. 6, 225; Tr. 69-72.  That was his choice, but it was not a reasonable choice under the circumstances or one that was in the best interests of the Corporation.  Accordingly, the financial consequences flowing from that choice must be borne by Ben personally.

These consequences include: 1) the fees and trespass penalties imposed by the BLM; 2) legal expenses incurred in disputing the grazing fees and trespass penalties owed and in appealing the BLM's decision to the IBLA; 3) operating losses and expenses of the Nevada ranch incurred as a result of boarding the brood herd in Washington from 1996 (when the cattle could have been returned to the Montezuma Allotment) through 2002 (when the cattle were sold); 4) the value of the cattle seized in 2001 (less any amount received at auction); and 5) the depreciation in value of the Nevada ranch resulting from the loss of grazing rights.

Similarly, I find that initiating a lawsuit against the

29   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

federal government in 2003 and incurring exorbitant legal fees without consulting Bill or obtaining the Corporation's authorization was outside the parameters of the business judgment rule.  Had Ben paid the grazing fees and resumed a cattle operation, the lawsuit likely would not have occurred.  Further, like the decisions to withhold grazing fees and to appeal the BLM's regulatory authority, initiating a lawsuit against the federal government was not within the ordinary course of managing the Nevada ranch and was not reasonable given the amount of debt incurred and the minimal likelihood of success.

Indeed, notwithstanding the well-written and researched report prepared by Michael Van Zandt for purposes of this proceeding, Ex. 218, it is highly questionable whether it would be reasonable under any circumstances for Ben to pursue a takings claims against the United States for the loss of grazing rights after *Ben refused to pay the fees for the grazing permit*.  Time and time again, courts have ruled that grazing leases, permits, or preferences do not confer a compensable property right in the underlying land.  See, e.g., Public Lands Council v. Babbitt, 529 U.S. 728, 742-43 (2000) ("As discussed above, the Secretary has long had the power to reduce an individual permit's AUMs or cancel the permit if the permit holder did not use the grazing privileges, did not use the base property, or violated the Range Code."); United States v. Fuller, 409 U.S. 488, 494 (1973) ("The provisions of the Taylor

30   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Grazing Act quoted *supra* make clear the congressional intent that
no compensable property right be created in the permit lands
themselves as a result of the issuance of the permit."); Fed. Lands
Legal Consortium ex rel. Robart Estate v. United States, 195 F.3d
1190, 1196 (10th Cir. 1999) ("Because grazing permits confer not a
'right,' but merely a 'privilege,' courts have held that such
permits (and thereby their terms and conditions) do not constitute
'property' for the purposes of the Fifth Amendment's Takings
Clause."); Diamond Bar Cattle Co. v. United States, 168 F.3d 1209,
1217 (10th Cir. 1999) ("This license was revocable at the
government's pleasure and conferred no right in [the permittees] or
their predecessors to graze a specific allotment of land."); Alves
v. United States, 133 F.3d 1454, 1457-58 (Fed. Cir. 1998) (neither
grazing permits nor preferences "constitutes a property interest
compensable under the Fifth Amendment); Hage v. United States, 35
Fed. Cl. 147, 171 (Fed. Cl. 1996) ("Moreover, value which the
permit adds to the base property and reasonable expectations of
private parties on the ability to graze upon public lands alone do
not create a property interest.").

Even in Hage, the Court of Federal Claims "did not find that
the plaintiffs' water right included a right to graze on land
adjacent to the water . . . but instead found a very limited right
to graze cattle within 50 feet on each side of an *established
Mining Act ditch right-of-way*." Colvin Cattle Co., Inc. v. United

31  - FINDINGS OF FACT AND CONCLUSIONS OF LAW

States, 67 Fed. Cl. 568, 575 (Fed. Cl. 2005) (emphasis added); see Hage v. United States, 51 Fed. Cl. 570, 580 (Fed. Cl. 2002). In fact, Hage explicitly rejected the argument that vested water rights confer a right to graze on appurtenant land: "At most, [the plaintiffs] may have a right to go on to the land to access the water in which they have a vested right." Hage, 51 Fed. Cl. at 591; see also Hage, 35 Fed. Cl. at 171 ("The court also understands that without a grazing permit, the ranch may become worthless. But the court emphasizes that plaintiffs' investment-backed expectations and reliance on the privilege to graze do not, in themselves, create a property interest in the rangeland or the permit.").

Ben did not and does not allege that the Corporation possesses an established ditch right-of-way under the Mining Act or that the BLM denied access to the water or diverted the water, thus rendering Hage of little precedential value. See Colvin, 67 Fed. Cl. at 575 & n. 7; see also Diamond Bar Cattle Co., 168 F.3d at 1216-17 (explaining that "the property interest . . . asserted by plaintiffs and recognized as potentially compensable in *Hage* was a narrow right to forage along the waterfront. Here, plaintiffs do not assert a right to forage only along the waterfront or a right to lead their cattle to water solely to drink, but a right to occupy and possess, without federal authorization, 174,396 acres of federal land for cattle grazing purposes").

32   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Moreover, I do not find that his reliance on counsel's advice insulates Ben from responsibility. Or. Rev. Stat. § 60.357(2)(b). While Ben's counsel advised him that the Corporation might have a viable claim against the United States, Ex. 218, counsel did not advise Ben to go forward with his claim given the high costs involved, the risk to Corporation assets, Ben's failure to consult Bill, and the slim chance of success. Or. Rev. Stat. § 60.357(3). Horton v. Whitehill, 121 Or. App. 336, 341-42, 854 P.2d 977 (1993). Notably, Ben funded the litigation with Corporation funds, even though the Corporation's grazing rights on the Montezuma Allotment had been lost, and the 40 Bar Ranch was no longer a viable cattle ranch.  It was simply not reasonable for Ben to place the Corporation's remaining assets - including the assets of the Oregon ranch - at risk on the slim-to-none chance that the Court of Federal Claims would set aside years of overwhelming precedent and find that the Corporation's water rights conferred a right to graze cattle on the Montezuma Allotment, even after Ben refused to pay the requisite grazing fee. Ex. 18, pp. 12-18; Diamond Bar Cattle Co., 168 F.3d at 1217 ("Plaintiffs contend their water right is of little utility if their cattle have no place to graze. If true, the fault lies with plaintiffs, who were fully apprized of the consequences of failing to renew their permits.").

Therefore, I conclude that Ben is personally responsible for all legal fees incurred through Corporation's suit against the

United States.  If such fees were paid with Corporation funds, Ben and Juanita's shareholder equity shall be adjusted accordingly.  If such fees have not been paid, they are the responsibility of Ben and Juanita or of the newly-formed Nevada subsidiary.

Finally, I address the sale of the brood herd in 2002.  Bill asserts that Ben did not confer with him before the herd was sold. Ben agrees that he did not discuss the sale with Bill but thought Bill wanted him to sell the herd.  Tr. 92-93.  Given the Corporation no longer had rights to graze on the Montezuma Allotment, Ben had no place to pasture the cattle, and keeping them in Washington was a losing proposition.  Therefore, even though the Corporation did not authorize Ben's decision to sell the herd, I find that it is protected by the business judgment rule.

Regardless, Bill argues that Ben should be held accountable for the proceeds of the brood herd, because he kept the proceeds for his own benefit rather than that of the Corporation.  Ben admitted that proceeds from the sale of the herd were used for personal living expenses and legal fees.  However, for the reasons discussed below, I do not find that Ben should be personally accountable for any living expenses that were routinely paid by the Corporation.  However, any proceeds that were used to pay legal fees associated with Ben's IBLA appeals or the 2003 lawsuit shall be charged against Ben's shareholder equity as discussed above.

2.  Personal Expenses

Ben claims that Bill should be accountable for extraordinary personal expenditures paid by the Corporation. Ben and Bill both agree that they had a "tacit agreement" that they could spend corporate funds for certain personal expenditures. For example, both lived in houses and used vehicles that belonged to the Corporation but did not personally pay rent, gasoline, or maintenance expenses. Tr. 321-22. Ben maintains that Bill's expenses went beyond this agreement and that he used Corporation funds for "extraordinary" personal expenditures.

Aside from a "summary" of checks written from the Oregon account, however, Ben submits little to support this claim. However, I find more persuasive and relevant the testimony of Mr. Dickey that the Corporation's accounting records were some of the most complete and accurate he had ever reviewed for a closely-held corporation. Further, both Bill and Ben regularly provided an accounting of their expenditures to their accountants, and if the amount was deemed to be excessive or personal, the accountants would charge back that amount to Ben or Bill. Tr. 286-88.

Absent expert testimony from the Corporation's accountants regarding what items are considered excessive or personal, I will not endeavor to discern from incomplete summaries what expenditures from the Oregon and Nevada checking accounts should be deemed "personal." I agree with Bill that if either Bill's or Ben's expenditures had caused the Corporation's accountants concern,

those expenditures would have been charged back to them.   Notably, certain items that might have been questioned in the past, such as the purchase of ATVs, are now reasonable in light of Bill's declining health and movement disorder.   See Tr. 214, 220-22. Accordingly, aside from the Nevada losses and expenses charged to Ben personally as described above, shareholder equities shall not be adjusted to reflect extraordinary expenses.

### 3.  Ben's Salary

Ben claims that Bill has not paid him a salary since 2002, and that the shareholder equities should reflect his salary since then. Bill argues that Ben is not entitled to a salary, because Ben had no operation to run that would have warranted a salary and kept the proceeds from the sale of the brood herd.  I agree.

The primary business of the Corporation was raising and selling cattle.   After the loss of grazing rights in 1997, the confiscation of cattle on the Montezuma Allotment in 2001, and the sale of the brood herd in 2002, Ben did neither sold nor raised a significant number of cattle.  Ben testified that after he sold the brood herd, the 40 Bar Ranch was not really in operation - there was no herd and no place to keep them.  Tr. 96.  Even if Ben kept forty to fifty head of cattle on the Goldfield lots, it is undisputed that Ben controlled the proceeds from the sale of the brood herd, and he could have paid (and essentially did pay) himself a salary.   Therefore, the shareholder equities will not

reflect an adjustment for Ben's salary since 2002.

C.  Fair Market Value of Oregon and Nevada Ranches

The final issue for resolution is the value of the Oregon and Nevada operations.  Ben relies on a higher value of the Oregon ranch than Bill, although both agree on the value of the timber. With respect to the Nevada ranch, Ben claims that it is worth only $100,000, while Bill maintains that Ben is estopped from asserting that the Nevada ranch is worth less than the millions claimed in his suit against the federal government.  Instead, Bill argues that the Oregon and Nevada ranches should be considered equal in value.

Incidentally, the parties agree that the value of the Corporation's cattle is $535,832.  Ex. 22, p.2.  Therefore, I accept this value for the cattle.

1.  Valuation of the Oregon Ranch

As described above, the Oregon ranch consists of 15,000 acres of pasture and timberland on five parcels of land:  the Home Place, Wildcat, Huckleberry, Modoc, and Paradise.  Additionally, the Oregon ranch includes a fair amount of marketable timber.  Ben submitted an December 2005 Timber Cruise and Valuation that values the timber at $2,297,840.  Ex. 205, p. 8.  Bill does not dispute the accuracy of that appraisal.  Therefore, I find the timber's value to be $2,297,840, barring the submission of evidence that timber prices have fallen dramatically since December 2005.

Excluding the timber, the parties dispute the value of the

Oregon ranch itself.   Bill relies on the appraisal of Robert M.
Burns, ARA, which values the Oregon ranch at $6,107,000, including
timber.   Ex. 23.   Mr. Burns testified that he assumed value of
merchantable timber at $1,906,000.   Therefore, if the $1.9+ million
figure is not considered, Mr. Burns appraised value of the ranch is
$4,201,000.   Ex. 23, p. 37.   In turn, Ben relies on the appraisal
of Robert Smith, MAI/ARA, which values the Oregon ranch at
$6,400,000, excluding timber.   Ex. 203.

    I adopt the appraisal of Burns and find the value of the
Oregon ranch to be $4,201,000, excluding timber.   I find persuasive
Mr. Burns's testimony that the appraisal relied on by Ben presumes
a scenario in which the potential seller would break up the ranch
into small parcels, and sell those parcels individually to
recreational users.   Ex. 203, pp. 29-32.   Indeed, Mr. Smith finds
that the ranch "is prime to split into smaller ownerships to meet
the ready real estate market that Mr. Rehder has been
experiencing." Ex. 203, p. 32.   Mr. Rehder is an individual in the
Eastern Oregon area who purchases larger parcels, splits the land
into smaller parcels and resells them at a profit to recreational
enthusiasts.   Ex. 203, pp. 30-32.   I agree with Mr. Burns that the
basis for Mr. Smith's appraisal, although not without some
supporting data, is speculative in nature.   Tr. 243-44, 254.   In
fact, Mr. Burns testified that Mr. Rehder is now out of the market
in light of price fluctuations.   Tr. 245.   Further, Mr. Smith's

appraisal does not necessarily consider the value of the ranch as a whole.  Tr. 342, 351.

In contrast, Mr. Burns' appraisal takes account of the highest and best use of the ranch for agricultural and supporting timber and  recreational purposes as a whole and is based on many sales of comparable ranch properties in the area.  Ex. 23, pp. 30, 39, 45-66; Tr. 241-42, 246.  Further, Mr. Burns gave differing per-acre appraisals based on irrigated meadows, farmstead land, and range and timberland adjusted for time, size, merchantable timber and improvements - all in light of comparable sales.  Ex. 23, p. 23. Given the nature of ranch, I find that Burns appraisal best reflects the fair market value of the Oregon ranch as a whole.

Therefore, I adopt the Burns appraisal and value the Oregon ranch at $4,201,000 and the timber at $2,297,840, for a total fair market value of $6,498,840.

### 2.  Valuation of the Nevada Ranch

At one time, the Corporation ran as many as 1200 head of cattle on the Montezuma Allotment.  After the BLM began calculating grazing fees according to AUM levels rather than acreage, the herd decreased in size to approximately 800 or 900 head at the time Ben moved the herd to Washington.  Now, without rights to graze on the Montezuma Allotment, the value of the 40 Bar Ranch as a cattle operation is diminished, given the lack of water and suitable pasture.

Nevertheless, Bill argues that the ranches should be deemed equal in value, because Ben claimed in his federal lawsuit that the Nevada operation was worth millions.  Ex. 11. Accordingly, Bill argues that Ben is judicially estopped from asserting that the Nevada ranch is worth far less than the Oregon ranch.

I do not find that judicial estoppel applies in this case.  In Colvin Cattle Co., Inc. v. United States, no finding was made regarding the value of the Nevada ranch.  Further, no evidence suggests that Ben benefitted from or Ben detrimentally relied on the damages claimed by Ben in the complaint.  See Day, 336 Or. at 524-25, 86 P.3d 678.  Regardless of the damages Ben claimed in a previous proceeding when attempting to recover monetary compensation from the federal government, I will rely on the expert valuations submitted in this proceeding.

Bill submitted an appraisal of the Nevada ranch that assumed the Corporation still held grazing rights in the Montezuma Allotment.  The appraisal gave a fair market value of the 40 Bar Ranch including the lots in Goldfield at $690,000.  Ex. 24.  While this figure is helpful in determining the depreciation in value of the Nevada ranch for which Ben is personally responsible, it is not the current market value of the ranch.  Notably, neither party submitted an appraisal of the estimated fair market value of the Nevada ranch "as is" - without grazing rights on the Montezuma Allotment -  or the depreciation in value of the 40 Bar Ranch

40   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

resulting from the loss of grazing rights on the Montezuma Allotment. Although Ben rendered an opinion that the Nevada ranch is now worth about $100,000, Ben admitted that he has no expertise as an appraiser. Tr. 398. Further, no party submitted any valuation of the Corporation's attendant water rights that are recognized by the BLM. Without a current appraisal of the Nevada ranch, I cannot determine accurately the parties' equity interests in the Corporation.

In sum, I find that the value of the Nevada ranch cannot be determined without a current appraisal. The parties will be required to submit an appraisal, unless they come to agreement on the current market value of the Nevada ranch. However, I agree with Bill that utilizing the current market value of the Nevada ranch, without adjustment, does not reflect accurately the parties' equity interests. Therefore, as explained above, depreciation in the value of the 40 Bar Ranch resulting from the loss of grazing rights shall be borne by Ben as an adjustment to his shareholder equity.

<u>CONCLUSION</u>

After the proceedings to date in this case, it seems only fitting that this opinion ends with a whimper instead of a bang. As explained above, the parties must submit the following financial information before I can make a final decision on the distribution of assets:

41  - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.  the amount of fees and trespass penalties owed to the BLM;

2.  the amount of legal fees Ben incurred in disputing the grazing fees, trespass penalties, confiscation of cattle and in appealing the BLM's decision to the IBLA, and the amount that has been paid by the Corporation;

3.  the amount of legal fees Ben incurred in filing suit against the federal government in 2003, and the amount that has been paid by the Corporation;

4.  the operating losses and expenses of the Nevada ranch incurred as a result of boarding the brood herd in Washington from 1996 through 2002;

5.  a current appraisal of the Nevada ranch; and

6.  the depreciation in value of the Nevada ranch resulting from the loss of grazing rights.

The parties are ordered to submit this information within ninety (90) days from the date of this order.  The parties are free to submit information individually, although joint submissions are always encouraged.  Finally, the court is willing to extend the deadline to facilitate further settlement discussions.

IT IS SO ORDERED.

Dated this   1   day of August, 2007.


_____/s/ Ann Aiken_____
                Ann Aiken
        United States District Judge

42   - FINDINGS OF FACT AND CONCLUSIONS OF LAW